UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THERESA WHEELER,                      :
        FOR J.B.,                     :
                                      :CIVIL ACTION NO. 3:14-CV-524
            Plaintiff,                :
                                      :(JUDGE CONABOY)
      v.                              :
                                      :
CAROLYN W. COLVIN,                    :
Acting Commissioner of                :
Social Security,                      :
                                      :
            Defendant.                :
                                      :
_____

**MEMORANDUM**

The above-captioned matter concerns the appeal of Plaintiff

Theresa Wheeler on behalf of her niece J.B. from the Acting

Commissioner's denial of Supplemental Security Income ("SSI").

(Doc. 1.)  The Administrative Law Judge ("ALJ") who evaluated the

claim found that J.B. did not have an impairment or combination of

impairments that met or equaled the severity of a listed impairment

and, therefore, was not disabled.  (R. 15-24.)  With this action,

Plaintiff argues that the determination of the Social Security

Administration is error: 1) the ALJ did not fulfill his duty to

develop the record; 2) the ALJ erred when he failed to find J.B.

has an "extreme" or "marked" limitation in the domain of

Interacting and Relating with Others; 3) the ALJ erred when he

failed to find J.B. has a "marked" limitation in the domain of

Attending and Completing Tasks; and 4) the ALJ did not properly

consider treating physicians' opinions and failed to find a

"marked" limitation in the Caring for Yourself domain.  (Doc. 11 at 18.)  For the reasons discussed below, we conclude remand is warranted.

## I. Background

### A.   Procedural Background

On May 18, 2011, Plaintiff filed an application for SSI on behalf of J.B., alleging disability beginning on May 5, 2011.  (R. 95.)  Plaintiff listed three disabling conditions: ADHD, learning disability, and ODD.  (R. 122.)  The claims were initially denied on July 13, 2011.  (R. 77-80.)  Plaintiff filed a request for a review before an ALJ.  (R. 88-91.)  On July 16, 2012, Plaintiff, J.B., and their attorney, Jonathan Foster, Esq., appeared at a hearing before ALJ Gerard W. Langan.  (R. 28.)  By decision of August 30, 2012, ALJ Langan determined that J.B. had not been disabled from the date of filing, May 18, 2011, through the date of the decision.  (R. 24.)  He made the following findings of fact and conclusions of law:

> 1.   The claimant was born on June 4, 1996. Therefore, she was an adolescent on May 18, 2011, the date application was filed, and is currently an adolescent (20 CFR 416.926a(g)(2)).
>
> 2.   The claimant has not engaged in substantial gainful activity since May 18, 2011, the application date (20 CFR 416.924(b) and 416.971 et seq.).
>
> 3.   The claimant has the following severe impairments: ADHD (attention deficit hyperactivity disorder) and ODD

(oppositional defiant disorder) (20 CFR 416.924(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.   The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6.   The claimant has not been disabled, as defined in the Social Security Act, since May 18, 2011, the date the application was filed (20 CFR 416.924(a)).

(R. 81-92.)

On October 2, 2012, Plaintiff filed a Request for Review with the Appeal's Council. (R. 6-8.) The Appeals Council denied Plaintiff's request for review of the ALJ's decision. (R. 1-5.) In doing so, the Appeals Council stated that it had looked at additional evidence provided and determined there was no basis to change the ALJ's decision. (R. 1-2.) Because the Appeals Council found no reason to review the ALJ's decision, the ALJ's decision became the final decision of the Commissioner. (R. 1.)

On March 19, 2014, Plaintiff filed the action in this Court appealing the Acting Commissioner's decision. (Doc. 1.) Defendant filed her answer and the Social Security Administration transcript on May 22, 2014. (Docs. 7, 8.) Plaintiff filed her supporting

3

brief on August 5, 2014.  (Doc. 11.)  Defendant filed her opposition brief on August 25, 2014.  (Doc. 12.)  Plaintiff did not file a reply brief and the time for doing so has passed. Therefore, this matter is ripe for disposition.

**B.    *Factual Background*[1]**

J.B. was born on June 4, 1996.  (R. 15.)  She was sixteen years old at the time of the hearing on July 16, 2012.  (*Id.*)  She was living with her aunt and guardian, Plaintiff Theresa Wheeler, in Canton, Pennsylvania.  (R. 38.)  As summarized by her attorney at the ALJ hearing (and shown in the extensive record), J.B. had "kind of a rough upbringing."  (R. 37.)  J.B. and her siblings had been placed in foster care due to her biological mother's neglect. (R. 327.)  J.B. had three placements in foster homes, in two of them she was asked to be removed, and in the third she asked to be removed.  (R. 329.)

J.B. was in KidsPeace in Allentown for residential treatment from August 20, 2008, to April 16, 2010.  (R. 323-452.)  She was admitted for evaluation of mental health issues.  (R. 373.) Residential placement was recommended based on J.B.'s "past failed placement, as well as intensive family issues and her significant

---

[1]   Given the lengthy record, we provide some general background but focus primarily on the facts and evidence relied upon by the parties in support of their arguments (Doc. 11 at 20-26; Doc. 12 at 11-21) for approximately one-year preceding the alleged onset date up to the date of the ALJ's decision, August 30, 2012.  We include the facts and evidence summarized by the ALJ in support of his decision.  (R. 16-12.)

distractability." (R. 328.)  Her prognosis was determined to be

"fair" at the time of the evaluation by Dr. Adnan Zawawi on

September 24, 2008.  (R. 328.)  On March 11, 2010, Dr. Nimala Yarra

provided the following summary:

> She is young an[d] immature and has been
> rebellious since she came to treatment.
> Before she was placed in residential
> treatment she was in several foster homes
> where she was unable to adjust.  She had
> difficulty dealing with family issues.  Even
> though she took a long time to adjust in
> recent months she had improved much in her
> cooperation, communication skills and
> relationship with staff, as well as family.
>
> In recent months, she has been able to
> accept the need for out-of-home placement and
> is willing to go for an interview to be
> placed in a therapeutic foster home.  She has
> been getting along well with her grandmother
> and aunt.  She has a better understanding
> about her family issues and why she cannot
> return to her family at this time.  Her
> coping skills are better.  She has good
> leisure skills.
>
> Insight and judgment are improved.  When
> she had vocal tics for a day or two after her
> home visit, about six weeks ago, I had to
> hold her Adderall and Seroquel for a few
> days.  When she did not receive these two
> medicines, she was highly distractible,
> irritable and labile in mood.  So, I had to
> reintroduce both medications without any
> adverse effect.  At this time, she is back on
> all of the medications and is tolerating them
> well and also needs all of them, except maybe
> Strattera.  Since she is on Strattera and
> Adderall, I suggested to taper off Strattera
> for a trial to see if she can be managed on
> Adderall.  She is quite willing to do so.

(R. 357-58.)  Dr. Yarra's recommendations were that J.B. would be

requiring Therapeutic Foster Care as a medical necessity and
monthly medication management by the psychiatrist as part of her
aftercare.  (R. 358.)  She also recommended individual, group and
family therapies to improve her mood management, anger control and
interpersonal skills.  (*Id.*)  On April 15, 2010, the day before her
discharge from KidsPeace, Clinician Dale Phillips noted that J.B.
had a stable mood and affect, and she did not have suicidal
ideations or thoughts of self injury.  (R. 446.)  Placement with
her aunt was being worked out at the time.  (*Id.*)

From May 5, 2010, to July 29, 2010, (the first records for the
relevant time period) J.B. was treated at the Tioga Counseling
Center by David August, D.O., a board certified psychiatrist.  (R.
493-500.)  He evaluated J.B. on May 5, 2010, noting that she was
being evaluated "as she is on many psychotropic medications."  (R.
496.)  Under "History of Chief Complaint," Dr. August noted that
J.B.'s "main problems have been primarily foul language that she
uses in school.  This often leads to getting suspended.  She is
also verbally aggressive toward other children at times and can be
very obnoxious and argumentative.  Jessica has a history of eloping
from placements."  (*Id.*)  He further noted that her foster
placement "appears to be going well," and that she did well in
school except for math.  (R. 498.)  Dr. August's "Objective Mental
Status Examination" included the findings that J.B. demonstrated
excellent abstract thinking, her thought processes were logical and

goal directed without looseness of association or flight of ideas, she reported that she never has suicidal or homicidal thoughts, and never has hallucinations.  (*Id.*)  He added that she had a very outgoing personality and seems to like to argue.  (R. 499.)  Dr. August diagnosed J.B. with ADHD, ODD, and Mathematics Disorder, and reported a GAF of 55.  (*Id.*)  Dr. August eliminated one of J.B.'s medications because of its severe adverse consequences and ineffectiveness for the targeted insomnia.  (*Id.*)  He also opined that J.B. had been overmedicated and many of the medicines did not have a positive impact on the course of her illnesses.  (R. 500.)

In a June 4, 2010, progress note, Dr. August reported that the medication elimination had gone well, J.B. reported that she was "sleeping reasaonbly," and that her personality appeared to be unchanged--"She enjoys teasing and confrontation in a friendly way."  (R. 495.)  He also reported that J.B. had "no suicidal or homicidal thoughts, no psychotic thinking, and was not depressed." (*Id.*)  Her GAF was 55.  (*Id.*)

In his July 2, 2010, progress note, Dr. August reported that J.B.'s behavior had been excellent, and she had not been having temper problems.  (R. 494.)  Her GAF was 55.  (*Id.*)  He added that he planned to further adjust her medications.  (*Id.*)

On July 29, 2010, Dr. August noted that the medication adjustment had gone well, and J.B. reported she was not having sleeping or temper control problems.  (R. 493.)  Dr. August

7

observed her to be calm and friendly, with no irritability, she did not seem to be having hyperactivity or attention problems, was free from psychotic thinking, and had no depressive symptoms. (R. 493.) Her GAF was 58. (*Id.*)

In a July 30, 2010, Mental Health Intake Evaluation at Northern Tier Counseling performed by a clinician and signed by Lucille E. Venturanza, M.D., it was noted that J.B. had been placed with her aunt a week before the evaluation, that she had been in and out of foster homes, and "has behavioral outbursts - yelling, temper, disobedient, swearing." (R. 504-10.) She was being seen for medication management. (R. 504.) The "Clinician's Impressions (Overall Clinical Summary)" included the following: J.B. came in needing medication management only; she reported losing her temper and being disobedient; and she was respectful at the intake. (R. 509.) J.B.'s GAF was 55. (*Id.*)

On August 26, 2010, J.B. was evaluated by Dr. Venturanza at Northern Tier. (R. 526.) Her chief complaint was her behavior. (*Id.*) J.B. denied current depression but noted having been depressed when she was in KidsPeace. (R. 528.) Her GAF was recorded to be 55. (*Id.*) She was to be seen again in four weeks. (R. 529.)

Improvement was noted at J.B.'s September 23, 2010, psychiatric clinic visit with Dr. Venturanza. (R. 530.) It was noted that J.B. was compliant with medications and her next

8

appointment was to be in two months.  (*Id.*)

In September 2010, J.B. was in the Alternative Education Program in the Northeast Bradford School District.  (R. 228.)  At the time she was receiving Mobile Therapy Services through Northwestern Human Services ("NHS") up to four hours per week and her aunt reported she had a good relationship with her therapist. (*Id.*)  In September 2010, Ms. Wheeler stated on a parental input form that J.B. helps with chores at home, likes to read, gets up in the morning without being told, does what is asked of her, and enjoys making things.  (R. 212.)  Ms. Wheeler expressed concern that some of J.B.'s comments may be rude and hurtful to others and that she makes comments that should not be said.  (*Id.*)

At a January 5, 2011, clinic visit, Dr. Venturanza noted that J.B.'s medication compliance was questionable.  (R. 531.)  She also noted that J.B. was struggling in school.[2]  (*Id.*)  Dr. Venturanza changed J.B.'s medications and wanted to see her back in one month. (*Id.*)

As reported in a January 19, 2011, Reevaluation Report from Northeast Bradford High School, J.B. was participating in the general education setting in all classes but math, which she was taking in a learning support setting.  (R. 275.)  In the "Emotional/Social Adjustment" portion of the report, it was stated that J.B.

---

[2]  Many notations in the hand-written report are not legible.

> enjoys reading, cooking, working on crafts
> and helping out at church.  She is reported
> to get along with most people, though she has
> a difficult relationship with her biological
> mother.  She does not get along with all her
> teachers. [J.B.] typically gets along with
> her peers and wants to make friends.  In the
> community, she can be disrespectful at times,
> and may talk out or swear. [J.B.] seems to
> have low self esteem and often makes negative
> statements about herself.  She has been
> involved with various counselors on and off
> since approximately her kindergarten year.

(R. 276.)

On January 25, 2011, a Mental Health Intake Evaluation for the partial hospitalization program indicates J.B.'s problems to be lack of adjustment to school, and lack of compliance with rules and expectations at home and school.  (R. 546.)  She was referred to the program due to lack of motivation and lack of respect for rules and expectations.  (*Id.*)  She was failing ninth grade at the time.  (R. 548.)  J.B.'s attitude toward authority and peers was noted to be poor; she had "a few" friends.  (R. 553.)  J.B.'s GAF was reported to be 46.  (R. 554.)  Jenny Young, LSW, is identified as the clinician.  (*Id.*)

On January 25, 2011, an Initial Treatment Plan was completed for Northern Tier Counseling's Children/Adolescent Partial Hospitalization Program and signed by Ms. Young and Dr. Venturanza.  (R. 513.)  The Master Treatment Plan document dated February 2, 2011, noted J.B.'s diagnosis of Oppositional Defiant Disorder; her strengths were noted to be that she enjoys reading and is family

oriented; her criteria for care indicated that she "has had poor adjustment to regular education due to not following rules and directions, lack of work completion and disrespect for authority." (R. 514.)  Three treatment goals were identified: show respect for authority; decrease anger and aggression; and complete assigned tasks.  (R. 513.)

On February 17, 2011, J.B. had a psychiatric evaluation at Northern Tier Counseling.  (R. 522.)  The evaluator was Marine Khojabekyan, M.D., and the supervising physician was Lucille E. Venturanza, M.D.  (*Id.*)  The report notes that J.B. was admitted to the Partial Hospitalization Program at her own request.  (*Id.*)  Her chief complaint was feeling frequently angry and outbursts.  (*Id.*)  Her diagnosis was ADHD "not optimally controlled" and ODD and OCD "well controlled."  (R. 524.)  J.B. had a GAF of 60 and Phsycosocial stressors were noted to be moderate: her primary problem at school was with self esteem and peer interaction; and she had a good support system with her aunt and felt comfortable at home.  (*Id.*)

The March 2, 2011, Northern Tier Partial Program Master Treatment Plan indicates J.B.'s anticipated discharge from the program was during the week of March 14, 2011, when she would return to Northeast Bradford.  (R. 518.)  Ms. Wheeler was to schedule an appointment through NHS for mobile therapy while J.B. was at school.  (*Id.*)  The Plan also indicates J.B. made progress

on all identified goals during the review period.  (R. 519-20.)
She generally participated well in groups and was respectful to
peers and staff.  (*Id.*)  She could be obstinate and rude when she
did not want to do something but would usually complete it with
prompting.  (*Id.*)  J.B. generally completed work and assignments
with few problems, although there was one incident where she
refused to complete her work and was rude to staff and her teacher.
(*Id.*)  J.B. generally was able to control her anger during the
review period but had two days where she became angry over not
being able to do what she wanted.  (*Id.*)  It was noted in one
instance she was able to calm down and refocus after a silent
lunch, and that she enjoys attention when angry or upset.  (*Id.*)
This Master Treatment Plan was signed by Jody McCarty, primary
therapist, Jenny Young, LSW, clinical supervisor, George Sowerby,
M.D., psychiatrist, Ms. Wheeler, and J.B.  (R. 521.)

At a March 26, 2011, Psychiatric Clinic visit at Northern Tier
Counseling, Teresa Hennessey, R.N., noted that J.B. was not
compliant with medications but both J.B. and her aunt reported that
things were going well.[3]  (R. 532.)  J.B. was back at Northeast
Bradford school and reported to be getting along with students and
teachers, her grades were "ok," and her sleep pattern was stable.
(*Id.*)

---

[3]  Many clinic visits conducted by Teresa Hennessey are also
signed by Dr. George Sowerby.

On March 29, 2011, Teresa Hennessey, R.N., noted that J.B. continued to do well and was stable.  (R. 535.)

On May 24, 2011, Ms. Hennessey noted a GAF of 46 and some academic decline.  (R. 537.)  J.B. reported she was getting along with others, and had a stable sleep pattern.  (*Id.*)  She also noted that J.B. seemed to be making progress with her coping skills. (*Id.*)

On June 7, 2011, Sue Middaugh, a learning support teacher at Northeast Bradford, completed a Teacher Questionnaire.  (R. 132-39.)  Ms. Middaugh had known J.B. for three months and saw her daily during school for science and study hall.  (R. 132.) Plaintiff was a ninth grade student who was at an eighth grade instructional level in reading, math and written language.  (*Id.*) J.B. was in regular classes except for math.  (*Id.*)  In the domain of "Acquiring and Using Information," Ms. Middaugh rated J.B. as having an obvious problem in comprehending and doing math problems.[4]  (R. 133.)  She additionally noted that J.B. was nervous in big groups, had low self-esteem for ability and was easily distracted and off task.  (*Id.*)  She added that J.B. had aide support in regular education classes, study halls in the Learning Support Room, and math and science in the Learning Support Room.

---

[4]  The following is the available assessment range on the questionnaire: 1--No problem; 2--A slight problem; 3--An obvious problem; 4--A serious problem; 5--A very serious problem.  (*See* R. 133.)

13

(*Id.*)  In the domain of "Attending and Completing Tasks," Ms. Middaugh noted that J.B. had obvious problems in the following areas: "Focusing long enough to finish assigned activity or task"; "Completing class/homework assignments"; "Working without distracting self or others"; and "Working at reasonable pace/finishing on time."  (R. 134.)  She added that J.B. waits until the last minute to do things, and, even with support in place, she procrastinates.  (*Id.*)  In the domain of "Interacting and Relating with Others," Ms. Middaugh noted obvious problems in the areas of "Expressing anger appropriately" and "Relating experiences and telling stories."  (R. 135.)  She noted it was necessary to implement behavior modification strategies, i.e., J.B. was sent to Alternative Education Program during the school year. (*Id.*)  Ms. Middaugh added that J.B. did well at the program and returned to her home school where she was put in small size classes with supports and accommodations.  (*Id.*)  J.B. had no problems in the domain of "Moving About and Manipulating Objects."  (R. 136.) In the domain of "Caring for Himself or Herself," Ms. Middaugh found obvious problems in the following areas: Handling frustration appropriately; Being patient when necessary; Identifying and appropriately asserting emotional needs; Responding appropriately to changes in own mood (e.g., calming self); and "Using appropriate coping skills to meet daily demands of school environment."  (R. 137.)  Ms. Middaugh added that J.B. had mood swings daily, when she

14

was feeling anxious or irritated she would ask to go to guidance or sent to time out or to the nurse and she would do these behaviors when trying to avoid work or tests.  (*Id.*)

At J.B.'s June 27, 2011, psychiatric clinic visit to Northern Tier Counseling, Ms. Hennessy noted that J.B. was "getting along with everyone," her mood was stable, her sleep pattern stable, and she denied anger outbursts.  (R. 577.)  She reported a GAF of 50. (*Id.*)

In a Disability Determination Explanation dated July 13, 2011, Ira Gensemer, Ed.D., determined that J.B. was not disabled.  (R. 73.)  He reviewed evidence from KidsPeace, Northeast Bradford Junior/Senior High School, Northern Tier Counseling, and David August, D.O.  (R. 70-71.)  Based on the evidence, including the Teacher Questionnaire, Dr. Gensemer determined that J.B.'s limitations were less than marked in the domains of Acquiring and Using Information, Attending and Completing Tasks, Interacting and Relating with Others, Caring for Yourself, and Health and Physical Well-Being.  (R. 72.)  He determined that J.B. had no limitation in the domain of Moving About and Manipulating of Objects.  (*Id.*)

On July 28, 2011, J.B. was seen by Dr. Sowerby for her Northern Tier clinic visit.  (R. 576.)  J.B.'s aunt, Ms. Wheeler, reported that J.B.'s behavior was worsening, and J.B. wanted to drop out of school.  (*Id.*)  Dr. Sowerby reported a GAF of 60 and noted that J.B. was diffusely angry and had very low frustration

15

tolerance.  (*Id.*)  He changed her medications and wanted to see her in one month.  (*Id.*)

On September 16, 2011, J.B. was seen by Ms. Hennessey who assessed a GAF of 60 and noted that J.B. had run out of Adderall one week before.  (R. 573.)  J.B.'s mood was reported to be "ok." (*Id.*)  Although her anger issues had improved somewhat, Ms. Hennessey reported that J.B. still showed poor insight into why her anger increased or effective coping skills.  (*Id.*)  J.B. was verbally aggressive at home, but school staff had not reported any behavioral concerns.  (*Id.*)  J.B. reported she had friends at school and her grades were low.  (*Id.*)  Overall, Ms. Hennessey found improved progress.  (*Id.*)  She suggested that J.B. ask for more academic support at school.  (*Id.*)

On October 28, 2011, Ms. Hennessey assessed a GAF of 45.  (R. 571.)  Plaintiff had not been compliant with medications: Ms. Wheeler reported finding them in her room after J.B. hid the medications instead of taking them.  (*Id.*)  J.B. was skipping classes and/or going to the nurse's office, her academics were declining, and she found school boring.  (*Id.*)  Ms. Hennessey found J.B. to be more sarcastic and inappropriate, especially when discussing serious topics.  (*Id.*)  J.B. was not completing her school work, remained defiant toward her guardians, and reported poor sleep approximately seven nights per month.  (*Id.*)  Ms. Hennessey noted that Ms. Wheeler would supervise J.B. taking all

16

medications, and J.B. would see Dr. Sowerby at his next available appointment.  (*Id.*)

On December 7, 2011, J.B. saw Dr. Sowerby who assessed a GAF of 45.  (R. 570.)  J.B. was not compliant with her medications. (*Id.*)  She was failing in school, angry all the time, and not sleeping well.  (*Id.*)  Dr. Sowerby indicated a plan to change medications and resume mobile therapy.  (*Id.*)

On February 7, 2012, Ms. Hennessey again assessed a GAF of 45 and noncompliance with medications.  (R. 569.)  She stated that J.B. was initially sullen but her affect became brighter.  (*Id.*) Ms. Wheeler's twelve-year-old son had returned home from a residential treatment facility, and J.B. admitted to increase in swearing and verbal talkback.  (*Id.*)  A few weeks previously, J.B. had a physical altercation with her biological mother.  (*Id.*)  Her family relocated to Canton.  (*Id.*)  J.B. became defiant at Canton School and was placed in alternative education in Monroeton.  (*Id.*) J.B. reported that she was acclimating to the new school and her grades were improving.  (*Id.*)  She also reported that her sleep was improving.  (*Id.*)  It was recommended that J.B.'s current medications be continued and better compliance was stressed. (*Id.*)

On April 5, 2012, Teresa Hennessey, R.N., assessed a GAF of 50.  (R. 674.) She reported that J.B.'s mood was good, she was attending alternative education, and no behavioral concerns.  (*Id.*) Ms. Hennessey also noted that J.B.'s sleep and appetite were stable

and she was tolerating the chaotic home environment.  (*Id.*)  J.B. denied overt sadness and irritability.  (*Id.*)

In a Northern Tier Treatment Plan Update dated April 26, 2012, signed by Dr. Sowerby and Clinician Jenelle Crayton, M.S.W., J.B.'s diagnosis was ADD and ODD "as evidenced by increased anger, depressed mood, and occasional anxiety with OCD tendencies."  (R. 672.)  Her GAF was reported to be 50.  (*Id.*)

On May 4, 2012, Ms. Hennessey assessed a GAF of 48 and reported that J.B. was not compliant with her psychotropic medications.  (R. 675.)  J.B. reported an increase in anger outbursts and admitted to running out of Ambien which resulted in insomnia and irritability.  (*Id.*)  Ms. Hennessey noted that J.B.'s academics were still good but she was defiant at home and had a conflicted relationship with her mother.  (*Id.*)  Ms. Hennessey stressed medication compliance and recommended outpatient therapy with Jenelle Crayton.  (*Id.*)

On May 25, 2012, J.B. was admitted to Robert Packer Hospital. (R. 600.)  The chief complaint was depression with thoughts of killing herself.  (*Id.*)  Ms. Wheeler had taken J.B. to the Emergency Room because J.B. had made suicidal statements and thoughts of wanting to "carve up her teacher."  (*Id.*)  According to Ms. Wheeler, J.B. "got quite upset when her mother did not want her to come to meet her and then did not take no for an answer and got very angry, agitated and threatened to hurt herself."  (R. 604.)

18

J.B.'s History and Physical includes notations that J.B. was bored in school, and she had a boyfriend for about a year and the relationship was going well. (R. 600.) J.B. was alert and essentially cooperative, her mood was depressed and irritable. (R. 601.) J.B. was not found to have suicidal or homicidal ideation but had poor insight and judgment. (*Id.*) J.B.s GAF was 30. (R. 602.) The plan was to admit J.B. for diagnostic evaluation and therapeutic program including individual and group psychotherapy and pharmacotherapy. (R. 602.)

J.B. was discharged from Robert Packer on June 1, 2012. (R. 604.) The Discharge Summary indicates that J.B.'s eye contact was good, her mood euthymic, her affect full range and appropriate. (*Id.*) She had no paranoia, grandiosity or perceptual disturbance. (*Id.*) She had no suicidal or homicidal thoughts, intentions or plans. (*Id.*) J.B.'s concentration was fair, her memory and intelligence limited, and her insight, judgment, and impulse control fair. (*Id.*) J.B. was diagnosed with impulse control disorder, intermittent explosive disorder, attention deficit hyperactivity disorder, and oppositional defiant disorder. (R. 604.) Problems with the school, her cousin, and her mother were noted as stressors. (*Id.*) Her GAF was 45. (R. 605.) J.B.'s discharge condition was stable, she was to be evaluated for the summer program at Northern Tier Counseling on June 6, 2012, and her prognosis was guarded.

On June 6, 2012, J.B. attended a Northern Tier Psychiatric Clinic Visit conducted by Teresa Hennessey. R.N.  (R. 676.)  J.B.'s GAF was recorded as 45 and she was compliant with her medications. (*Id.*)  Ms. Hennessey noted J.B.'s recent hospitalization and reported that J.B. was struggling with anger outbursts and increased verbal defiance.  (*Id.*)  J.B. reported that she was "walking the streets" and spending time with people who are using illicit drugs.  (*Id.*)  She said she was bipolar. (*Id.*)  Ms. Wheeler, who attended the visit, said she was having a difficult time managing J.B.'s behaviors.  (*Id.*)  Ms. Hennessey recorded J.B. to be hostile, negative, defensive, and arugmentative.  (*Id.*)  She noted that J.B.'s medications should be changed, she would be referred to the summer partial hospitalization program, and J.B. was refusing to attend outpatient therapy with Jenelle Crayton.

On the July 17, 2012, Initial Treatment Plan for the Children/Adolescent Partial Program, Dr. Sowerby recommended that J.B. attend the partial program five days a week to address anger, impulsivity and self harm.  (R. 623.)  He diagnosed J.B. with Impulse Control Disorder, ADHD, and ODD.  (*Id.*)  Dr. Sowerby noted J.B.'s severe out of home chaotic family and a GAF of 47.[5]  (*Id.*)

---

[5]  This was the most current record before the ALJ at the time he rendered his decision on August 30, 2012.  Therefore, records submitted by Plaintiff's counsel on November 21, 2012, (R. 670-88) were not considered by the ALJ.  As noted in the text, the Appeals Council considered the information and did not find that it provided a basis to change the ALJ's decision.  (R. 1-2.)  Because both parties reference some documents submitted after the decision

At the ALJ hearing held on July 16, 2012, J.B. and Ms. Wheeler, who were represented by an attorney, testified.  (R. 28.) J.B. was sixteen years old at the time of the hearing and would be entering eleventh grade in the fall.  (R. 33, 39.)

The ALJ talked about the records he had reviewed and discussed additional records with Plaintiff's attorney, agreeing to keep the

---

(Doc. 11 at 14; Doc. 12 at 16), we will briefly review them here.

On July 31, 2012, Dr. Sowerby saw J.B. at her Psychiatric Clinic visit which Plaintiff's therapist (Ms. Young) and Ms. Wheeler also attended.  (R. 681.)  J.B. reported that she was compliant with her medications, she had been acting out, and was sexually promiscuous, sometimes with older men.  (*Id.*)  J.B.'s behavior was very oppositional, and Dr. Sowerby found her to be sullen, argumentative, angry, and intense.  (*Id.*)  He determined her condition to be unimproved and recommended continued therapy and medication management.  (*Id.*)

On August 14, 2012, Dr. Sowerby again saw J.B.  (R. 682.) Others in attendance were Kathleen Morrison, R.N., J.B.'s foster father, and her teacher.  (*Id.*)  J.B. reported that she had not taken her recommended medications.  (*Id.*)  Dr. Sowerby provided the following explanation:

> Stopped taking Adderal-XR a week ago she says, but later . . . when foster [father] arrived, he stated he watched her take her meds last night and the night before.  He does, however, also state that in the past, they've suspected her of selling them on the street as she came into a lot of money and they don't know where she got it.

(R. 682.)   Dr. Sowerby also noted J.B.'s foster father stated that she was lying and saying she was going to her mother's when she was running the streets, having sex with boys.  (*Id.*)  Again Dr. Sowerby noted her condition to be unimproved and recommended continued therapy.  (*Id.*)

J.B. cancelled her Psychiatric Clinic Visits on September 17, 2012, September 21, 2012, and September 25, 2012.  (R. 686-88.)

record open for two weeks as requested.  (R. 32-34, 67.)  The ALJ also inquired about getting a second, more recent teacher questionnaire.  (R. 34.)  Attorney Foster apparently had distributed one to a teacher and agreed to try to track it down. (R. 34.)

J.B.'s attorney stated that J.B. went to Northeast Bradford in ninth and tenth grades then went to Canton.  (R. 37.)  She went for only two days and was released into an altnernative education program.  (*Id.*)  In the fall she would again be attending Canton. (*Id.*)  J.B. testified that she was "kicked out" of Canton for refusing to go to class.  (R. 39.)  She refused because the classes were too big, even though previously she had wanted to go to Canton.  (*Id.*)

J.B. said she likes to read and has "college level" reading. (R. 40.)  When she starts a book, it bothers her if she does not finish it.  (R. 54.)  She also likes video games.  (*Id.*)  She stated she does not participate in clubs or organizations in school, and is not involved in activities inside or outside of school.  (*Id.*)

J.B. testified that she takes care of herself, including "sometimes" taking her medications.  (R. 41.)  She added that her aunt (Ms. Wheeler) organizes her pills and then "usually" she remembers to take them.  (R. 42.)

When she is not going to school, J.B. stated that, on a

22

typical day, she would take her pills, "eat, hang out with people, take naps, watch TV, get on the computer, go to the library, and then take my Ambien and I fall asleep." (R. 42.)  J.B. added that she hangs out with friends, though she does not have a lot of friends. (*Id.*)  She goes to the library to read and use the computer, spending some time on Facebook. (R. 43.)  When she goes on Facebook, she completes what she intended to do. (R. 54.)

J.B. stated that school days are boring and full of work, after school she goes to bed, and--though she has homework--she does not do it because it's too hard. (R. 43.)  Sometimes she tries to do homework with friends. (*Id.*)

Concerning her hospitalization at Robert Packer, J.B. testified that she was there for about one week "because she was mad about something and [] was sick and tired of everybody's croc." (R. 44.)

J.B. stated that she did not usually get into arguments with other kids at school. (R. 45.)  She avoids other kids because she "used to" not get along with them. (*Id.*)

J.B. called the alternative education program "stupid," there was less work, and her grades were better the second half of the year. (R. 45-46.)

When asked about chores at home, J.B. reported that she took the clothes off the line and feeds the animals. (R. 46.)  When asked about being mad all the time and what she was mad about, J.B.

responded "Everything."  (R. 48.)  She stated the reason she did not want to obey adults is that her mother "was a crappie mother" and she didn't listen to her when she was younger.  (R. 48.)

When asked about hurting herself, J.B. stated that she used to give herself eraser burns, and she had pulled her hair but never right out of her head.  (R. 51.)  She said her medications helped her.  (R. 51-52.)

J.B. stated she had threatened a teacher and used foul language but recognizes that she should not.  (R. 52.)

J.B.'s aunt and guardian, Plaintiff Theresa Wheeler, testified that in general things had been "not so good"--J.B. had outbursts, pulling her hair, screaming, and jumping up and down, episodes that can last up to one hour.  (R. 55-56.)  The outbursts could be about "[a]nything from food to being hot, to not getting her own way." (R. 56.)  Ms. Wheeler reported J.B. sometimes refuses to do chores and swears at her--she does not give her much to do because J.B. gets confused and goes into an outburst.  (*Id.*)

Ms. Wheeler stated J.B. does not do very well at school but acknowledged that she had been doing fine at Northeast Bradford "at the end of last year."  (R 57.)  Ms. Wheeler said J.B. has two or three friends, though Ms. Wheeler does not care for them.  (R. 57-58.)

Regarding medication, Ms. Wheeler said J.B. takes it when Ms. Wheeler watches her but sometimes she puts it under her tongue and

24

spits it out.  (R. 58.)  She also said that the medication is effective when J.B. takes it.  (*Id.*)

When asked about completion of tasks and homework, Ms. Wheeler stated that she has to keep reminding J.B.--J.B. "sometimes" does things if Ms. Wheeler stays on her.  (R. 63-64.)

Ms. Wheeler testified about the circumstances leading to J.B.'s Robert Packer hospitalization: Ms. Wheeler did not allow J.B. to go to her mother's and J.B. pushed Ms. Wheeler's son to the ground and threatened to kill him; J.B. then ran up the road threatening to kill herself; Ms. Wheeler called the police; and J.B. swore at the policeman who told Ms. Wheeler she had to do something with J.B. or she would be arrested.  (R. 59.)  She was admitted because of threats of self-harm and harm to others.  (R. 66.)

Finally, Ms. Wheeler stated that over the two-year time she has had custody of J.B., she thinks her behavior has gotten "a little worse."  (R. 66.)

## II. Disability Determination Process

The federal Supplemental Security Income program provides benefits to disabled individuals who meet certain statutory income and resource limitations.  42 U.S.C. § 1381.  The relevant statutory provision states that

> [a]n individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment,

> which results in marked and severe
> limitations, and which can be expected to
> result in death or which has lasted or can be
> expected to last for a continuous period of
> not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i).  Pursuant to 20 C.F.R. § 416.924, disability for children is determined using a three-step analysis: 1) whether the child is doing a substantial gainful activity; 2) whether the child has a "severe" impairment or combination of impairments; and 3) whether the impairment or combination of impairments meets, medically equals, or functionally equals the listings.  20 C.F.R. § 416.924(a).

Relevant to this case is the inquiry of whether the child's impairment or combination of impairments functionally equals the listings.[6]  Functional equivalence for children is explained in 20 C.F.R. § 416.926a:

> If you have a severe impairment or
> combination of impairments that does not meet
> or medically equal a listing, we will decide
> whether it results in limitations that
> functionally equal the listings.  By
> "functionally equal the listings," we mean
> that your impairment(s) must be of listing-
> level severity; i.e., it must result in
> "marked" limitations in two domains of
> functioning or an "extreme" limitation in one
> domain.

20 C.F.R. § 926a(a).  The six domains are: "(i) Acquiring and Using Information; (Ii) Attending and Completing Tasks; (Iii) Interacting

---

[6]  Plaintiff does not argue that J.B.'s impairments meet or medically equal a listing.  (*See* Doc. 11.)

and Relating with Others; (Iv) Moving about and Manipulating Objects; (V) Caring for Yourself; and (Vi) Health and Physical Well-being.  20 C.F.R. § 416.926a(b)(1).  A limitation is "marked" when it "interferes seriously with your ability to independently initiate, sustain, or complete activities" and "marked" limitation "also means a limitation that is more than moderate but less than extreme."  20 C.F.R. § 416.926a(e)(2)(i).  A limitation is "extreme" if the "impairment(s) interferes seriously with your ability to initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  A reviewing court is "bound by the ALJ's findings of fact if they are supported by substantial evidence in the record."  *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Plummer*, 186 F.3d at 427 (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011).  Therefore, we will not set aside the Commissioner's final

27

decision if it is supported by substantial evidence, even if we would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

### A. *General Considerations*

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  These proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.*  "These proceedings are extremely important to the

claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F.2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

Finally, the Third Circuit has recognized that it is necessary for the Secretary to analyze all evidence. If he has not done so and has not sufficiently explained the weight he has given to all probative exhibits, "to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky*, 606 F.2d at 407. In *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981), the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected. "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected

29

is required so that a reviewing court can determine whether the reasons for rejection were improper." *Id.* at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  Only where the ALJ rejects conflicting probative evidence must he fully explain his reasons for doing so.  *See*, *e.g.*, *Walker v. Comm'r of Soc. Sec.*, 61 F. App'x 787, 788-89 (3d Cir. 2003) (citing *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).  Further, the ALJ does not need to use particular language or adhere to a particular format in conducting his analysis.  *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

## B.  *Plaintiff's Alleged Errors*

As set out above, the ALJ found that J.B. has not engaged in substantial gainful activity since May 18, 2011.  *See supra* pp. 2-3.  At step two, he found J.B. has the severe impairments of ADHD and ODD.  *Id.*  At step three, he found J.B. does not have an impairment or combination of impairments that meets or medically

equals, or functionally equals the severity of one of the listed impairments.  *Id.*  Plaintiff alleges the ALJ erred on four bases: 1) the ALJ did not fulfill his duty to develop the record; 2) the ALJ erred when he failed to find J.B. has an "extreme" or "marked" limitation in the domain of Interacting and Relating with Others; 3) the ALJ erred when he failed to find J.B. has a "marked" limitation in the domain of Attending and Completing Tasks; and 4) the ALJ did not properly consider treating physicians' opinions and failed to find a marked limitation in the Caring for Yourself domain.  (Doc. 11 at 18.)

## 1.   **Duty to Develop Record**

Citing the ALJ's affirmative obligation to assist the claimant in developing the record, Plaintiff asserts the ALJ failed to provide the necessary assistance.  (Doc. 11 at 19 (citing *Ventura v. Shalala*, 55 F.3d 900, 904 (3d Cir. 1995)).)  Specifically, Plaintiff maintains the ALJ "took no efforts to assist the Plaintiff in development of the record": he did not send a single interrogatory to any of J.B.'s teachers, treating physicians or mental health counselors; and his examination was limited and did not fill any perceived gaps necessary for a decision.  (Doc. 11 at 20.)  Defendant asserts the ALJ did not have a duty to further develop the record.  (Doc. 12 at 13-14.)  We conclude this claimed error is without merit.

"ALJ's have a duty to develop a full and fair record in social

security cases." *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995) (citing *Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995); *Smith v. Harris*, 644 F.2d 985, 989 (3d Cir. 1981)).  However, in general the "burden lies with the claimant to develop the record regarding his or her disability because the claimant is in a better position to provide information about his or her medical condition." *Money v. Barnhart*, 91 F. App'x 210, 215 (3d Cir. 2004) (not precedential) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. §§ 404.1512(a) and 416.912(a)).  The regulations provide that the ALJ's duty is to ensure that the claimant's complete medical history is developed on the record before a determination is made that the claimant is disabled.  *Money*, 91 F. App'x at 215; 20 C.F.R. § 416.912(d).  The medical history is developed for "at least the 12 months preceding" the filing of the claimant's application.  *Id.*  "Further, when the claimant is represented by counsel at the administrative hearing, the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997).  *Hawkins* concluded that where a claimant is represented by counsel, the ALJ ordinarily could require counsel to identify the issues requiring further development.  *Id.* (citing *Glass v. Shalala*, 43 F.3d 1392, 1394-96 (10th Cir. 1994) (refusing to remand for further development of the record where the ALJ had

carefully explored the applicant's claims and where counsel representing the claimant failed to specify the additional information sought)).  Further, an "ALJ's duty to develop the record does not require a consultative examination unless the claimant establishes that such an examination is necessary to enable the ALJ to make the disability decision." *Thompson v. Halter*, 45 F. App'x 146, 149 (3d Cir. 2002) (not precedential) (citing 20 C.F.R. §§ 404.1517, 416.917; *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)).

Here J.B. was represented by counsel, Jonathan Foster, Esq. Plaintiff does not claim that the medical history was not developed for "at least the 12 months preceding" the filing of the application on behalf of J.B.  *Money*, 91 F. App'x at 215; 20 C.F.R. § 416.912(d).  With this claimed error, Plaintiff does not identify how additional evidence would impact the ALJ's decision, i.e., how additional information from teachers, treating physicians or mental health counselors would affect the decision when the record contained information from these sources.

At the July 12, 2012, hearing, the ALJ talked about the records he had reviewed and discussed additional records with Attorney Foster, agreeing to keep the record open for two weeks as requested.  (R. 32-34, 67.)  The ALJ also inquired about getting a second, more recent teacher questionnaire and Attorney Foster apparently had distributed one to a teacher and agreed to try to

33

track it down.  (R. 34.)  The ALJ did not deem such additional questionnaire necessary, stating he was "just curious" if there was an update.  (R. 34.)  Attorney Foster did not provide any additional records until November 21, 2012--several months after the ALJ issued his decision.  (R. 670.)  Attorney Foster did not provide an additional teacher questionnaire.  He did not seek an extension of the two week period agreed upon at the hearing. Plaintiff did not identify any specific issues at the hearing that needed further development; no consultative examination was discussed or requested.  In this context, we cannot conclude that Plaintiff's request to be allowed two weeks to update records imposed an affirmative obligation on the ALJ to independently further develop the record.  Rather, Plaintiff's attorney had an affirmative obligation to do so if relevant information supporting the claim was available.  *See* 20 C.F.R. § 416.1540(b).  Therefore, we find this claimed error without merit.

2.   **Attending and Completing Tasks Domain**

Plaintiff claims the ALJ erred in finding that J.B. does not have a "marked limitation" in the domain of Attending and Completing Tasks.  (Doc. 11 at 22.)  Defendant asserts that substantial evidence supports the ALJ's decision regarding this domain.  (Doc. 12 at 17.)  We conclude Plaintiff has not met her burden of establishing that the ALJ erred in his decision that J.B. had less than a marked limitation in this domain.

The regulation governing functional equivalency for children explains that this domain considers "how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them." 20 C.F.R. § 416.926a(h).

Plaintiff asserts the ALJ misinterprets Ms. Wheeler's testimony concerning J.B.'s ability to complete household tasks "as Ms. Wheeler testified that [J.B.] refuses to clean her room and does not make her bed." (Doc. 11 at 22 (citing R. 56).) Without citation to the record, Plaintiff adds that J.B. engages in anger outbursts when asked to do household chores, her school record reflects she fails to focus on tasks, fails to complete activities of interest, and becomes easily distracted. (Doc. 11 at 22.)

When the ALJ asked Ms. Wheeler whether she made J.B. clean her room, Ms. Wheeler responded: "I might try but she won't do it." (R. 56.) Ms. Wheeler also testified regarding chores: "I don't give her much because she gets confused and then she'll go into an outburst." (*Id.*) The ALJ correctly noted that J.B. feeds the animals and takes the clothes off the line. (R. 20.) (*See* R. 56.) This evidence shows that J.B. sometimes completes tasks--a showing consistent with a less than marked limitation in the domain of attending and completing tasks.

Similarly, while J.B.'s school records indicate she has

35

obvious problems with focusing on tasks and distractability, the problems were not deemed serious by Ms. Middaugh, the learning support teacher who completed the Teacher Questionnaire.  (R. 134.) Plaintiff does not provide citation to evidence in support of the assertion that J.B. does not complete activities of interest, but the record does not support the assertion: J.B. testified that she likes to read and when she starts a book, it bothers her if she does not finish it (R. 40, 54); she also testified that when she goes on Facebook, she completes what she intended to do (R. 54).

The ALJ gave some weight to the opinions in the Teacher Questionnaire, including the findings that the claimant has obvious difficulties focusing long enough to finish assigned activities, completing class/homework assignments, working without distracting herself or others, and working at a reasonable pace and finishing on time.  (R. 18.)  As noted previously, the Teacher Questionnaire did not indicate "a serious problem" in any activities listed under the attending and completing tasks domain.  (R.  134.)  Because a limitation is "marked" when it "interferes seriously with [the] ability to independently initiate, sustain, or complete activities," 20 C.F.R. § 416.926a(e)(2)(i), the Teacher Questionnaire findings support the ALJ's determination that J.B. had less than a marked limitation in this domain.  Similarly, and with no argument from Plaintiff to the contrary regarding this domain, the ALJ was entitled to rely on the opinion of Disability

Determination Services Psychological Consultant Ira Gensemer, Ed.D., that J.B. had less than marked limitations in all domains.

Because the Teacher Questionnaire was completed in June 2011 (R. 132-39) and the Disability Determination Explanation in July 2011 (R. 69-75), the opinions relied upon do not assess the time period from their respective dates to the ALJ's date of determination, August 30, 2012 (R. 24).[7]  However, Plaintiff does not assert and has not presented evidence that a review of the later time period would warrant a different result.

Because Plaintiff has failed to present evidence to show that J.B. has a marked limitation in the domain of Attending and Completing Tasks and has failed to show that the ALJ's decision on this issue is not supported by substantial evidence, we affirm the ALJ's decision on this issue.

3.  **Interacting and Relating with Others Domain**

Plaintiff claims the ALJ erred in finding that J.B. does not have an "extreme" or at least "marked" limitation in the domain of Interacting and Relating with Others.  (Doc. 11 at 20.)  Defendant

---

[7]  The record shows that the Teacher Questionnaire was completed by a teacher who had consistent and frequent contact with J.B. over a three-month period and was aware of the difficulties J.B. had experienced before then.  (R. 132, 135.)  The opinions expressed in Dr. Gensemer's Disability Determination Explanation are based on a review of extensive records, including KidsPeace, Northern Tier Counseling, Northeast Bradford Junior/Senior High School, and David August, D.O., of the Tioga Counseling Center. (R. 70-71.)

asserts the ALJ correctly assessed evidence relevant to this

domain.  (Doc. 12 at 15.)   We conclude that remand is required for

further consideration of evidence relevant to this domain.

The regulation governing functional equivalency for children

explains that this domain considers

> how well you initiate and sustain emotional
> connections with others, develop and use the
> language of your community, cooperate with
> others, comply with rules, respond to
> criticism, and respect and take care of the
> possessions of others.
>
> (1) General.
>
> (i) Interacting means initiating and
> responding to exchanges with other people,
> for practical or social purposes. You
> interact with others by using facial
> expressions, gestures, actions, or words. You
> may interact with another person only once,
> as when asking a stranger for directions, or
> many times, as when describing your day at
> school to your parents. You may interact with
> people one-at-a-time, as when you are
> listening to another student in the hallway
> at school, or in groups, as when you are
> playing with others.
>
> (ii) Relating to other people means forming
> intimate relationships with family members
> and with friends who are your age, and
> sustaining them over time. You may relate to
> individuals, such as your siblings, parents
> or best friend, or to groups, such as other
> children in childcare, your friends in
> school, teammates in sports activities, or
> people in your neighborhood.
>
> (iii) Interacting and relating require you to
> respond appropriately to a variety of
> emotional and behavioral cues. You must be

able to speak intelligibly and fluently so
that others can understand you; participate
in verbal turntaking and nonverbal exchanges;
consider others' feelings and points of view;
follow social rules for interaction and
conversation; and respond to others
appropriately and meaningfully.

(iv) Your activities at home or school or in
your community may involve playing, learning,
and working cooperatively with other
children, one-at-a-time or in groups; joining
voluntarily in activities with the other
children in your school or community; and
responding to persons in authority (e.g.,
your parent, teacher, bus driver, coach, or
employer).

(2) Age group descriptors--

      . . . .

(v) Adolescents (age 12 to attainment of age
18). By the time you reach adolescence, you
should be able to initiate and develop
friendships with children who are your age
and to relate appropriately to other children
and adults, both individually and in groups.
You should begin to be able to solve
conflicts between yourself and peers or
family members or adults outside your family.
You should recognize that there are different
social rules for you and your friends and for
acquaintances or adults. You should be able
to intelligibly express your feelings, ask
for assistance in getting your needs met,
seek information, describe events, and tell
stories, in all kinds of environments (e.g.,
home, classroom, sports, extra-curricular
activities, or part-time job), and with all
types of people (e.g., parents, siblings,
friends, classmates, teachers, employers, and
strangers).

20 C.F.R. § 416.926a(l).

Plaintiff generally asserts that the ALJ failed to properly

address the extensive mental health records concerning this domain and offers little assessment of J.B.'s critical testimony.  (Doc. 11 at 21.)   Plaintiff specifically states the ALJ is factually incorrect that J.B. "hangs out with friends and goes on facebook." (Doc. 11 at 20.)   Plaintiff also states that the ALJ substituted his opinion for that of the treating physicians without sufficient explanation, and that he failed to consider J.B.'s ongoing bi-weekly mental health counseling sessions.  (Doc. 11 at 21.)

Regarding the opinions of treating physicians, Plaintiff does not identify, with or without citation to the record, the opinions which form the basis of this argument.  While we agree with the legal principles set out, Plaintiff's conclusory statement that the principles were violated fails to satisfy her burden of showing error.  Similarly, Plaintiff's assertion that "[t]he medical evidence in the record speaks for itself" (Doc. 11 at 21) does not satisfy her burden.[8]

Plaintiff's statement that the ALJ offered little assessment of J.B.'s testimony (Doc. 11 at 21) may be accurate, but, without more, it does not show error.  Other than the averment of factual inaccuracy noted above regarding friends and facebook, the only specific testimony Plaintiff references is that J.B. "attends

---

[8]  As recognized by the ALJ, treating professionals regularly diagnosed J.B. with ADHD and ODD.  (R. 17-18.)  Treating professionals also assessed J.B. to be doing well and improving at times and to be having greater difficulties at others.  *See supra* pp. 5-20.

partial education classes during the summer, does not have access to a computer at home and lives in a very rural setting with no friends." (*Id.* at 20.)  Plaintiff then opines: "Of course the sixteen year old [J.B.] would exaggerate to a certain extent in her testimony and she does not want to admit her lack of friends, but it is apparent from the record that she does not interact well with others." (*Id.* at 20-21.)

First, we find no factually incorrect statement in the ALJ's reference to friends and facebook.  J.B. testified that in the summer she hangs out with friends, though she does not have a lot of friends.  (R. 42.)  She said she sometimes tries to do homework with friends. (R. 43.)  Ms. Wheeler said J.B. has two or three friends, though Ms. Wheeler does not care for them.  (R. 57-58.)  J.B. testified that she goes to the library to read and use the computer, spending some time on Facebook.  (R. 43.)

Further, we do not find that Plaintiff's reference (without citation) to specific testimony concerning attendance at "Partial Education classes during the summer," and access to a computer at home (Doc. 11 at 20) provides a basis to undermine the ALJ's decision.[9]  Plaintiff's opinion that "the sixteen year old [J.B.]

---

[9] Plaintiff's reference to testimony that J.B. "lives in a rural setting with no friends" (Doc. 11 at 20) is taken out of context.  J.B. was asked about where her friends lived and whether her friends were "neighborhood friends."  (R. 47.)  J.B. responded: "No, we didn't even live in a neighborhood, we lived in the middle of nowhere."  (*Id.*)

would exaggerate to a certain extent in her testimony and she does not want to admit her lack of friends, but it is apparent from the record that she does not interact well with others" (*id.* at 20-21) is also lacking: no evidence of exaggeration is cited and the issue is not whether J.B. has a problem interacting with others (the ALJ recognizes she does), the issue is whether the problem is a "marked limitation."

The ALJ acknowledges that J.B. does not get along with adults and that she and her aunt testified that she will avoid other children at school. (R. 21.) The ALJ gave some weight to the opinion expressed in the Teacher Questionnaire that J.B. had obvious problems in this domain in the areas of expressing anger appropriately, and relating experiences and telling stories. (R. 18.) As discussed in the previous domain, an "obvious problem" does not equate with a marked limitation. The ALJ also expressed agreement with Dr. Gensemer's opinion that J.B. had less than marked limitations in this domain. (R. 19.)

Although Plaintiff's general averments do not satisfy her burden of showing error and some evidence of record supports the ALJ's determination, we agree with Plaintiff that he failed to properly address the extensive mental health records in his discussion of this domain. (Doc. 11 at 21; *see also* R. 21.) We find this failure to be problematic.

As set out above, the Third Circuit has recognized that it is

42

necessary for the Secretary to analyze all evidence.  If he has not done so and has not sufficiently explained the weight he has given to all probative exhibits, "to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky*, 606 F.2d at 407. In *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981), the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected.  "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Id.* at 706-07.

First we note that, in his general discussion, the ALJ extensively reviews evidence of record and observes that it "reflects variations in the claimant's mental functioning." (R. 18.)  He acknowledged reports of J.B. "getting along with everyone," stable mood, and lack of anger outbursts, as well as worsening behavior, incidents of physical and verbal aggression, and hospitalization for depression and suicidal thoughts.  (R. 18.) However, the ALJ does not address or take note of some probative records and findings from the relevant time period.  Evidence from the period beginning with J.B.'s April 26, 2012, Northern Tier Plan

43

Update (R. 672) and ending with the last record considered by the ALJ, the July 17, 2012, Initial Treatment Plan for the Northern Tier Children/Adolescent Partial Program (R. 623) shows increasing and persistent behavioral problems, many of which would be relevant to the domain of Interacting and Relating with Others.[10]  *See supra* pp. 18-20.

Also problematic is the fact that the ALJ does not discuss mental health records in his specific discussion of this domain. (*See* R. 21.)  The ALJ stated that Plaintiff "does not get along with adults" and testified that "she will avoid other children at school" but the mental health records show much more.  *See supra* pp. 5-20.  The record contains numerous references to matters to be considered in this domain,  *See* 20 C.F.R. § 416.926a(I), including: Plaintiff's problems complying with rules, responding appropriately to emotional and behavioral cues, following social rules of interaction, responding to others appropriately, and resolving conflicts.  *See supra* pp. 5-20.

Given the ALJ's failure to address probative exhibits relevant to the domain of Interacting and Relating with Others, we cannot say his decision is supported by substantial evidence. *Dobrowolsky*, 606 F.2d at 407.  Therefore, remand is required for

---

[10]  During this period, J.B.'s medication compliance was sporadic, and medication and therapy adjustments were tried and/or suggested.  Records received after the ALJ's decision indicate more of the same.  *See supra* n.5.  To the extent medication compliance is appropriately considered by the ALJ, he must do so explicitly.

the ALJ to properly analyze the evidence relating to this domain.

**4.  Caring for Yourself Domain**[11]

Plaintiff asserts the ALJ failed to properly assess the mental health records in the Caring for Yourself domain in which he found no limitation.  (R. 26.)  Defendant does not address this claimed error.  We conclude the ALJ's decision regarding this domain is not supported by substantial evidence.

The regulation governing functional equivalency for children explains that this domain considers

> how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area.
>
> (1) General.
>
> (i) Caring for yourself effectively, which includes regulating yourself, depends upon your ability to respond to changes in your emotions and the daily demands of your environment to help yourself and cooperate with others in taking care of your personal needs, health and safety. It is characterized by a sense of independence and competence. The effort to become independent and competent should be observable throughout your childhood.
>
> (ii) Caring for yourself effectively means

---

[11]  With her fourth claimed error, Plaintiff asserts the ALJ did not properly consider treating physician's opinions and did not properly assess the Caring for Yourself domain.  We address these issues separately.

becoming increasingly independent in making and following your own decisions. This entails relying on your own abilities and skills, and displaying consistent judgment about the consequences of caring for yourself. As you mature, using and testing your own judgment helps you develop confidence in your independence and competence. Caring for yourself includes using your independence and competence to meet your physical needs, such as feeding, dressing, toileting, and bathing, appropriately for your age.

(iii) Caring for yourself effectively requires you to have a basic understanding of your body, including its normal functioning, and of your physical and emotional needs. To meet these needs successfully, you must employ effective coping strategies, appropriate to your age, to identify and regulate your feelings, thoughts, urges, and intentions. Such strategies are based on taking responsibility for getting your needs met in an appropriate and satisfactory manner.

(iv) Caring for yourself means recognizing when you are ill, following recommended treatment, taking medication as prescribed, following safety rules, responding to your circumstances in safe and appropriate ways, making decisions that do not endanger yourself, and knowing when to ask for help from others.

(2) Age group descriptors--

. . . .

. . . .

. . . .

. . . .

> (v) Adolescents (age 12 to attainment of age
> 18). You should feel more independent from
> others and should be increasingly independent
> in all of your day-to-day activities. You may
> sometimes experience confusion in the way you
> feel about yourself. You should begin to
> notice significant changes in your body's
> development, and this can result in anxiety
> or worrying about yourself and your body.
> Sometimes these worries can make you feel
> angry or frustrated. You should begin to
> discover appropriate ways to express your
> feelings, both good and bad (e.g., keeping a
> diary to sort out angry feelings or listening
> to music to calm yourself down). You should
> begin to think seriously about your future
> plans, and what you will do when you finish
> school.

20 C.F.R. § 416.926a(h).

The ALJ found J.B. had no limitations in her ability to care for herself. (R. 23.) He stated that she "tends to her self care needs. She is able to dress herself as well as select her own outfits to purchase and to wear." (*Id.*)

Clearly this statement does not provide substantial evidence in support of the ALJ's determination in this domain. Nor do we find substantial evidence for the ALJ's determination either in his review of the evidence (R. 16-19) or the record in general. Rather, there is significant evidence contradicting the ALJ's conclusion.

The first problem with the ALJ's assessment of this domain is that he does not even address the emotional component of the domain: "we consider how well you maintain a healthy *emotional* . . . *state, including how well you get your . . . emotional wants and*

47

*needs met in appropriate ways; how you cope with stress and changes in your environment.*" 20 C.F.R. § 416.926a(h) (emphasis added).

Second, the Teacher Questionnaire contradicts the ALJ's conclusion. In the Questionnaire, J.B. was found to have an obvious problem in five of the ten areas identified in the domain of Caring for Himself or Herself: Handling frustration appropriately; Being patient when necessary; Identifying and appropriately asserting emotional needs; Responding appropriately to changes in mood (e.g., claiming self); and Using appropriate coping skills to meet daily demands of school environment. (R. 137.) J.B. experienced difficulties in these areas daily. (*Id.*) In his analysis of the Questionnaire, the ALJ gave "some weight" to the opinions expressed therein, acknowledging that in the Caring for Herself domain, the teacher opined that J.B. has obvious problems in the five areas identified above. (R. 18-19.)

Third Dr. Gensemer's opinion contradicts the ALJ's conclusion. Disability Determination Psychological Consultant Ira Gensemer, Ed.D., concluded J.B. had "less than marked" limitations in this domain. (R. 72.) The ALJ accepted Dr. Gensemer's opinions in all other domains, but disagreed in the domain of Caring for Yourself, finding no limitation. (R. 19.) The ALJ provided no explanation for the disagreement.

Finally, the record shows abundant evidence of J.B.'s difficulties in many areas identified in this domain: coping with

48

stress, changes in her environment, and changes in her emotions; displaying consistent judgment about the consequences of caring for herself; employing effective coping strategies; identifying and regulating her feelings, thoughts, urges, and intentions; taking responsibility for getting her needs met in an appropriate and satisfactory manner; following recommended treatment and taking medication as prescribed; responding to circumstances in safe and appropriate ways; and making decisions that do not endanger herself.  *See* 20 C.F.R. § 416.926a(h).

For all of these reasons, we conclude the ALJ's determination that J.B. has no limitation in the domain of Caring for Yourself is not supported by substantial evidence.  Therefore, remand is required for further consideration of this domain.

**5.   Treating Physician Opinions**

Plaintiff asserts the ALJ committed legal error by relying primarily on a non-examining individual with a doctorate in education who did not review the entire record, did not interview the Plaintiff and essentially had absolutely no basis for rendering any assessment.  (Doc. 11 at 23.)  Plaintiff further avers the ALJ fails to address Drs. Venturanza, Zawawi, Yarra, Chupella, and Sowerby in his decision, all of whom rendered assessments that Plaintiff had severely low GAF scores over a prolonged period of time.  (*Id.*)  Because we have concluded remand is required on other bases, analysis of certain treating physician evidence will be

49

required.  Therefore, we will provide only brief comments regarding this claimed error.

The "treating physician rule," is codified at 20 C.F.R. 404.1527(d)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986).  The regulation addresses the weight to be given a treating physician's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight."  20 C.F.R. § 416.927(d)(2).[12]  "A

---

[12] 20 C.F.R. 404.1527(d)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3)

cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted).  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).  When confronted with contradictory medical evidence, the ALJ may choose whom to credit, but in these instances there is an acute need for the ALJ to explain the reasoning behind conclusions.  *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001).  The *Fargnoli* court noted that the appeals court will vacate or remand a case where such an explanation is not present.  *Id.*

Concerning Plaintiff's claimed error in this regard, we note that although the ALJ does not name the treating physicians listed

---

through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

by Plaintiff, his review of the record includes notes and findings authored by Drs. Venturanza and Sowerby in "Psychiatric Progress Notes," "Psychiatric Evaluations," and "Psychiatric Clinic Notes." (R. 17-18.)  Drs. Venturanza and Sowerby are the doctors who treated J.B. during the relevant time period, Drs. Zawawi and Yarra having treated J.B. at KidsPeace from which she was discharged on April 16, 2010.[13]  *See supra* pp. 4-6.

Plaintiff's argument centers on consistently low GAF findings by Plaintiff's treating physicians.  (Doc. 11 at 25.)  Defendant maintains these scores do not represent treating physician opinions as defined in the regulations, and the Commissioner has clarified that the GAF scale is not dispositive of disability. (Doc. 12 at 18.)

The regulation addressing the evaluation of opinion evidence provides the following: "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

Here some notations within evaluations and progress notes

---

[13] Plaintiff provides no evidence of the context in which any of the named physicians treated J.B. and our review of the record does not indicate that Dr. Chupella treated J.B. during the relevant time period.

contain an assessment of the severity of J.B.'s impairments, her prognosis, and her symptoms. *See supra* pp. 5-20. GAF scores are regularly recorded. *Id.* While we agree with Defendant that the consideration of GAF scores has changed and they are no longer used (Doc. 12 at 18-19), here they are evidence of record which were appropriately used at the time. Therefore the ALJ should have addressed them, not merely recorded scores as he did in his opinion (R. 17-18). *See*, *e.g.*, *Solock v. Astrue*, Civ. No. 1:12-CV-1118, 2014 WL 2738632, at *6 (M.D. Pa. June 17, 2014) (recognizing change in consideration and use of GAF scores). Thus, upon remand, the ALJ should discuss Plaintiff's GAF scores and explain the weight he attributes to them.

### V. Conclusion

For the reasons discussed above, this case must be remanded to the Commissioner for further consideration consistent with this opinion. An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: September 18, 2014